**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| BEAT KITCHEN ON THE RIVERWALK, LLC, | |
| Plaintiff, | Case Number: |
| CITY OF CHICAGO; MICHELLE WOODS, NANCY VILLAFRANCA, LOTIKA PAI, ANDREW FORBES, JENNIFER KELLY, JAIME VIRAMONTES; and HAIRE'S GULF SHRIMP INCORPORATED, | Judge: <br><br> Magistrate Judge: |
| Defendants. | |

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF**

Plaintiff, Beat Kitchen on the Riverwalk, LLC ("Beat Kitchen"), by Leach | King | Klinger Law LLC, for its Complaint against the Defendants, the City of Chicago ("City"), Michelle Woods, Nancy Villafranca, Lotika Pai, Andrew Forbes, Jennifer Kelly, Jaime Viramontes, and Haire's Gulf Shrimp Incorporated ("Haire's"), states and alleges as follows:

**Nature of the Case**

1. This civil rights action challenges the City's intentionally discriminatory administration of a public contracting opportunity in violation of the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment, 42 U.S.C. § 1981, Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), the Illinois Constitution, and related state laws. Beat Kitchen brings this action under 42 U.S.C. § 1983, Title VI's private right of action, 28 U.S.C. §§ 2201-2202, and applicable Illinois law.

2. Beat Kitchen – a certified minority, Hispanic-owned Chicago business with a proven record of successful Riverwalk concession operations – submitted the only timely, complete, and responsive proposal for a concession contract under Specification No. 1293783, the

"City of Chicago – Department of Fleet and Facility Management – Request for Proposal to Operate Concessions on the Chicago Riverwalk" ("2024 Riverwalk RFP"). Despite Beat Kitchen's superior and rule-compliant submission, City officials privately and secretly invited another vendor to submit a proposal weeks after the publicly noticed deadline, and then evaluated and advanced that improper submission. This conduct directly violated the stated requirements, evaluation criteria, and Municipal Code of Chicago ("MCC"), which limits the City's authority to consider proposals to those submitted only after a publicly noticed solicitation. As alleged below, the solicitation occurred in an environment where City leadership had directed departments to increase opportunities for Black-owned businesses in contracting and the allocation of economic opportunities. Consistent with those directives, City officials and departments embedded policy frameworks into the subject evaluation and award that prioritized one racial identity, despite the fair, neutral, and transparent administration required by law.

3.      As a minority-owned business, Beat Kitchen supports the City's stated commitment to equity – equity grounded in transparency, consistent rules, and lawful process – that is, *genuine* equity. What Beat Kitchen cannot support – and what federal and state law forbid but took place – is the substitution of race-influenced directives and considerations for the rule-based evaluation required by law, the 2024 Riverwalk RFP, and the MCC. Those directives did not remain abstract. They translated directly into the administration of this solicitation.

4.      Acting under these directives, the City – through the Department of Fleet and Facilities Management ("2FM"), the Office of Budget and Management ("OBM"), and the individual Defendants – privately invited and accepted a late and deficient proposal from the race-favored vendor, altered and manipulated mandatory evaluation criteria, and applied undisclosed racial considerations that advantaged the privately invited vendor. The City departed from the

required evaluation framework and produced an outcome that awarded the contract to Haire's – the favored vendor – rather than through a lawful and non-discriminatory process to Beat Kitchen.

5.      The unlawful actions challenged here were not isolated errors or administrative lapses. They were the result of policymaker directives – publicly described as "racial equity," "budget equity," and "reparations" frameworks – that instructed City departments, including 2FM and OBM, to prioritize one racial identity in procurement, budgeting, and economic decision making. Public statements by Mayor Brandon Johnson ("Mayor"), including statements that City economic opportunities should disproportionately benefit Black Chicagoans, communicated operative expectations that these directives were to guide departmental decision making.

6.      Additional public statements by the Mayor, including interviews and public appearances widely reported in Chicago, reinforced that City contracting and economic initiatives were to be evaluated for their impact on Black Chicagoans. Together with mandatory departmental Racial Equity Action Plans, the Budget Equity Tool, and the Mayor's Reparations Task Force Executive Order, these directives constitute official municipal policy and final policymaker instruction governing how solicitations, including the one here, were to be administered.

7.      The individual Defendants, 2FM Commissioner, and Budget Director, operated under these directives and departmental mandates, which shaped their scoring, evaluation, and decisions for the 2024 Riverwalk RFP.[1] As alleged below, the City's policies, customs, practices, and policymaker-level directives – implemented through 2FM, OBM, and the individual

---

[1] Beat Kitchen does not presently assert individual capacity claims against the 2FM Commissioner or Budget Director. These officials are referenced solely in their official capacities, which are legally subsumed within the municipal defendant, the City. Should discovery reveal that either official personally engaged in or ratified conduct outside the scope of lawful authority, Beat Kitchen reserves the right to assert appropriate individual capacity claims.

Defendants – were a moving force behind the discriminatory administration of this procurement and resulting deprivation of Beat Kitchen's rights.

8.      In addition to these policymaker directives, the 2024 Riverwalk RFP was governed by mandatory statutory limits. Even if the solicitation includes permissive language about handling proposals, no such language can override or expand the 2FM Commissioner's statutory obligation under MCC § 10-36-145(d) to negotiate and execute concession agreements only after a publicly noticed solicitation. As set out below, the MCC's mandatory requirements govern the solicitation.

9.      Independently and importantly, the challenged procurement occurred within, and as part of, the federally funded Chicago Riverwalk Expansion Project, which was funded through Motor Fuel Tax Revenue Bonds, a federal Transportation Infrastructure Finance and Innovation Act (TIFIA) loan from the United States Department of Transportation (USDOT), and other federal and state funds. Even if the TIFIA loan may now be retired, the Riverwalk remains a publicly financed municipal program subject to ordinances and trustee-controlled fund requirements. Moreover, the City, 2FM, and OBM have received at all relevant times federal funds, including grants, rendering them subject to the nondiscrimination requirements of Title VI. The City expressly acknowledged this obligation in the 2024 Riverwalk RFP, which stated that the evaluation and contracting process would "affirmatively ensure" compliance with Title VI.

10.     Beat Kitchen seeks: (a) declaratory relief confirming that the challenged conduct violated federal, state, and municipal law; (b) injunctive and mandamus relief vacating the unlawful award and requiring that further evaluation and award under the 2024 Riverwalk RFP be conducted through a lawful, transparent, and non-discriminatory process, limited to proposals that were timely, complete, and responsive as of the publicly noticed deadline; and (3) damages for the injuries caused by Defendants' unconstitutional and unlawful conduct.

## The Parties

11.     Plaintiff, Beat Kitchen, is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Beat Kitchen successfully operated a Riverwalk concession under the City's prior licensing cycle and submitted a timely, compliant, and superior proposal in response to Specification No. 1293783, the 2024 Riverwalk RFP. Under the City's procurement ordinances, including MCC § 10-36-145 Chicago Riverwalk, mandatory evaluation criteria, prior course of dealing, and the Title VI nondiscrimination requirements expressly incorporated into the solicitation, Beat Kitchen possessed a legitimate claim of entitlement to a lawful, neutral, non-arbitrary, and rule-bound evaluation process. Beat Kitchen was arbitrarily scored, unlawfully disadvantaged, and deprived of that protected interest through a process that departed sharply from mandatory rules, procurement standards, and constitutional guarantees. Beat Kitchen's protected entitlement arises from specific mandatory statutory requirements, binding RFP provisions, and express representations that only timely, responsive proposals would be evaluated.

12.     Defendant, the City of Chicago, is a municipal corporation and a "person" within the meaning of 42 U.S.C. § 1983. At all relevant times, the City – acting through its highest executive official – the Mayor – served as the ultimate final policymaker for procurement practices, concession licensing, budget execution, and the administration of the Riverwalk concession program. The City carries out these functions through its departments and offices, including 2FM and OBM, and through officials like the Mayor, 2FM Commissioner, and Budget Director. 2FM and OBM are administrative arms of the City and do not have a separate legal existence. The discriminatory and procedurally deficient practices challenged in this action were, therefore, implemented, directed, ratified, and executed by the City acting through these departments, officials, and delegated policymakers.

13.     2FM is the administrative department of the City responsible for, among other things, issuing and administering solicitations for Riverwalk concessions. The 2FM Commissioner, Julie Hernandez-Tomlin, appointed by the Mayor, exercised delegated final policymaking authority within 2FM for the implementation, administration, and oversight of the subject procurement, including the development of the evaluation procedures, enforcement of mandatory procurement rules, and preservation of process integrity. Acting through the 2FM Commissioner and its staff, 2FM permitted, facilitated, and ratified material departures from mandatory procurement requirements, allowed the acceptance and scoring of an untimely and non-responsive proposal, tolerated deviations from objective evaluation standards, and failed to ensure the fair, lawful, and race-neutral process required by the 2024 Riverwalk RFP and by federal and state law. These actions and omissions are attributable to the City.

14.     OBM is the administrative department of the City responsible for fiscal oversight, budget authorization, and the development of budget policies that inform procurement and program administration, including the subject solicitation. Budget Director Annette Guzman, appointed by the Mayor, exercised delegated final policymaking authority within OBM for fiscal approvals and budget conditions relevant to the Riverwalk concession program. Acting through Budget Director Guzman and its staff, OBM issued and enforced fiscal directives and approval requirements that influenced departmental decision making regarding the subject procurement and contributed to deviations from the 2024 Riverwalk RFP's stated requirements and the distortion of the scoring and award process. These directives and actions are attributable to the City as municipal policy, custom, and/or practice.

15.     Defendants Michelle Woods, Nancy Villafranca, Lotika Pai, Andrew Forbes, Jennifer Kelly, and Jaime Viramontes (collectively, the "Evaluation Committee Members") were

City employees who personally reviewed, scored, evaluated, ranked, and recommended concession proposals submitted for the 2024 Riverwalk RFP. In carrying out these responsibilities, each Evaluation Committee Member was required to apply mandatory evaluation criteria established by the City, 2FM, and OBM, and to conduct the process in a lawful manner.

16.     Each Evaluation Committee Member had a mandatory duty to apply the stated scoring rubric faithfully, to follow applicable procurement rules and disqualification requirements, to treat similarly situated applicants equally, and to refrain from considering unauthorized or impermissible factors, including the use of race in a manner inconsistent with law and the 2024 Riverwalk RFP's requirement of a race-neutral evaluation. Instead, the Evaluation Committee Members engaged in conduct that violated these duties, including, among other things: applying unannounced or unauthorized scoring criteria, disregarding rules requiring disqualification of late or non-compliant proposals, materially departing from objective scoring standards, treating similarly situated vendors differently, and/or acting under supervisory directions and departmental pressures that resulted in the impermissible consideration of race in the scoring and recommendation process. These actions deprived Beat Kitchen of the fair, lawful, and neutral evaluation to which it was entitled. Each Evaluation Committee Member is sued in his or her individual capacity for these personal acts.

17.     Defendant Haire's is the vendor awarded the concession contract at the site previously operated by Beat Kitchen. Haire's benefitted from the unlawful scoring irregularities, procedural departures, and discriminatory considerations and practices challenged in this action. Haire's is named only so that injunctive and/or declaratory relief will bind all interested parties. Beat Kitchen does not presently seek damages from Haire's.

**Jurisdiction and Venue**

18. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Beat Kitchen asserts claims arising under the Constitution and federal civil rights laws, including claims under 42 U.S.C. § 1983 and Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), and claims enforcing rights secured by 42 U.S.C. § 1981. Jurisdiction is also proper under 28 U.S.C. §§ 1343(a)(3)-(4) because this action seeks to redress the deprivation, under color of state law, of rights secured by the Constitution and Acts of Congress providing for equal rights.

19. This Court has jurisdiction over Beat Kitchen's claims for declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202. An actual, justiciable controversy exists over the legality of Defendants' procurement practices, the validity of the concession award, and the resulting deprivation of Beat Kitchen's federal and state rights.

20. This Court has supplemental jurisdiction over Beat Kitchen's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same controversy.

21. Venue is proper in the Northern District of Illinois, Eastern Division, under 28 U.S.C. §§ 1391(b)(1)-(2), because the City of Chicago is located in this District, all individual Defendants reside or work in this District, and a substantial part of the events and/or omissions giving rise to Beat Kitchen's claims occurred in this District, including the issuance, scoring, administration, manipulation, and award of the 2024 Riverwalk RFP.

**Facts Applicable to All Counts**

I. **The Riverwalk Program and Its Public Finance Structure**

22. The Chicago Riverwalk is a major public infrastructure program and asset, not a discretionary amenity. Its construction, expansion, and ongoing operations have long been tied to

a multilayered public finance structure involving federal, state, and local funds, and continue to be administered by City departments that receive federal financial assistance.

23.     The Riverwalk Expansion was part of the City's Wacker Drive Reconstruction Program, a capital project that relied on federal financial assistance, including Motor Fuel Tax Revenue Bonds issued under the Chicago Municipal Code, approximately $232.7 million in Federal Aid Highway Program funds, local capital funds, and a nearly $100 million TIFIA loan from USDOT. The City accepted the TIFIA loan to help finance construction of the Riverwalk and pledged Riverwalk-related revenues and Motor Fuel Tax revenues to secure the federal obligation.[2]

24.     In connection with this structure, the City enacted ordinances requiring Riverwalk revenues, including concession rents, to be deposited into a dedicated fund and applied in accordance with federal and state requirements for as long as the TIFIA obligation remained outstanding. Indeed, the MCC identifies the Riverwalk as a revenue generating component of the federally assisted TIFIA financing program. *See* MCC § 2-32-1300 Riverwalk Fund.

25.     In 2021, the City refinanced several outstanding obligations, including the TIFIA loan, through a sales tax securitization transaction. That refinancing eliminated the active revenue pledge supporting the TIFIA loan, but it did not change the historical fact that the Riverwalk was constructed with federal financial assistance, nor did it alter the federal civil rights obligations the City assumed as part of that financing or its continued acceptance of federal grants.

26.     Significantly, the City, 2FM, and OBM – responsible for designing, issuing, evaluating, and administering the 2024 Riverwalk RFP – continue to receive federal financial

---

[2] *See* U.S. Department of Transportation, Build America Bureau, Riverwalk Expansion, https://www.transportation.gov/buildamerica/projects/riverwalk-expansion.

assistance today through federal grant programs, including, but not limited to, transportation, infrastructure, disaster recovery, facilities management, and capital planning grants.[3]

27.     Under Title VI of the Civil Rights Act of 1964, federal civil rights obligations apply not only to the specific project for which federal funds were initially provided, but to all operations of the department or agency that receives federal assistance. Because the City, 2FM, and OBM are and were at all relevant times federal funding recipients, the administration of the 2024 Riverwalk RFP, *i.e.*, evaluation procedures, scoring practices, and award decisions, is the operation of a federally assisted "program or activity" subject to Title VI and applicable civil rights requirements.

28.     Accordingly, the City's process for the 2024 Riverwalk concession award was not an isolated municipal contract. It was administered by the City and its federally funded departments, intertwined with a historically federally assisted capital project, and required to comply with federal nondiscrimination laws, including Title VI.

## II.     The City's Race-Priority Framework and Policymaker Direction

29.     The City has implemented a coordinated set of equity-focused directives within budgeting and economic development initiatives that apply to procurement, concessions, and departmental decision making. This framework was designed and is supervised by:

      a.  the Mayor's Office;

      b.  the Office of Equity and Racial Justice, part of the Mayor's Office (OERJ); and

      c.  OBM.

30.     As part of this framework, the City and OBM implemented a mandatory "Budget Equity Tool," described as the process through which departments must analyze progress, create racial equity goals for the upcoming year, and identify how their budgets will be executed to

---

[3] *See, e.g.*, City of Chicago Office of Budget & Management, 2025 Grant Detail Book, https://www.chicago.gov/content/dam/city/depts/obm/supp_info/2025Budget/2025_GrantDetailBook.pdf.

support those goals. The City instructs that "[b]udgets are in essence a moral document that highlight and make clear what we value as an institution."[4] The tool is mandatory for all departments, including 2FM and OBM, and functions as a required analytic lens for procurement and contracting decisions.

31.     Pursuant to MCC § 2-4-100, the City created OERJ and charged it with developing, coordinating, and enforcing: (A) a comprehensive racial equity and justice strategy for all City operations; and (B) racial equity action plans ("REAPs") to be created by each City department. All departments must complete a REAP and report annually to the Chief Equity Officer unless expressly exempted. The Chief Equity Officer must, in turn, provide written annual progress reports to the Mayor, City Council, and residents. These REAPs apply to all departmental workstreams, including procurement and concession administration.

32.     Central to this framework is the City's definition of "equity," which it characterizes as "both an outcome and a process."[5] As a "process," the City says "equity requires a new way of doing business," requiring City departments, including 2FM and OBM, to: (1) prioritize access and opportunities for groups who have the greatest need; (2) evaluate the burdens created by seemingly neutral systems; and (3) engage those most impacted as experts and co-creators of governmental decisions. The City instructs departments to evaluate all strategies, interventions, and resources in a way that prioritizes those who are most negatively impacted by existing systems.

_____

[4] *See* City of Chicago Office of Budget & Management, Chicago Budget Equity (webpage), https://www.chicago.gov/city/en/depts/obm/supp_info/chicago-budget-equity.html. *See also* Budget Equity FY 2023, https://www.chicago.gov/content/dam/city/depts/obm/supp_info/budget-equity/Budget-Equity-Tool-Final.pdf.

[5] *See* Chicago Office of Equity & Racial Justice, AIS Racial Equity Action Plan (Final 2023), https://www.chicago.gov/content/dam/city/sites/oerj/cohort-1-reaps/AIS_Racial%20Equity%20Action%20Plan_Final_2023%20(1).pdf.

Although permissible in concept, these directives become unlawful when used to override procurement rules or introduce race-priority directives into public contract awards.

33.     The established framework also draws from the City's *Healthy Chicago 2025* and *We Will Chicago* policies, both of which incorporate race-conscious priorities when assessing City programs and economic decisions. The City's *Healthy Chicago 2025* policy, created in 2020, identifies racial disparities as reasons to implement race-focused policy goals that influence City programs and economic decision making.[6]

34.     The *We Will Chicago* policy identifies "dark chapters" of Chicago's history – including Federal Highway Construction, Urban Renewal, Loss of Public Housing, Contract Sales, Housing Covenants, Blockbusting, Vacant Lots, School Closures, Policing, Industrial Pollution, and Downtown Development – and instructs departments, including 2FM and OBM, that present day procurement, concession, and investment decisions should serve as corrective measures.[7]

35.     As alleged in more detail below, public statements by City leadership, including the current administration, have repeatedly identified the group who has the greatest need as Black Chicagoans, and directed that procurement, concessions, and economic opportunities must be used to: (a) increase Black-owned and Black-operated businesses; (b) advance racial repair or "reparations"-style economic outcomes; and (c) direct opportunities and revenue streams toward this preferred racial constituency. These public commitments created an operative expectation

---

[6] *See* Chicago Department of Public Health, Healthy Chicago Report (v.10, Oct. 24, 2025), https://www.chicago.gov/content/dam/city/depts/cdph/community-health/healthy-chicago/Healthy-Chicago-Report-v10-EN-ax.10.24.2025.pdf.

[7] *See* City of Chicago Dep't of Plan. & Dev., *We Will Chicago: Citywide Plan Committee Final Report*,https://www.chicago.gov/content/dam/city/depts/dcd/we_will/we_will_documents/cpc/WWC_Final_CPC.pdf.

within departments, including 2FM and OBM, that one racial identity should be treated as a positive factor in procurement.

36.     In 2024, the Mayor signed a Reparations Task Force Executive Order[8] directing all City departments to incorporate principles of "racial repair," "racial advancement," and prioritization of Black Chicagoans into budgeting, procurement, and economic decision making. The Executive Order cites the same historical injustices identified in the City's equity frameworks and tasks OERJ and OBM with developing and administering a "Black Reparations Agenda," which advances race-priority directives in procurement and the steering of contracting opportunities to Black-owned businesses.

37.     These directives were widely publicized and emphasized to departmental heads and employees. Departmental leadership and employees – including 2FM, OBM, and the Evaluation Committee Members – understood that these directives applied to concession awards, procurement decisions, licensing authority, and evaluation processes, and applied them in this case.

### A.     Contemporary Statements by the City's Final Policymaker

38.     In addition to the City's formal directives, the City's final policymaker, the Mayor, has repeatedly made contemporaneous, publicly reported statements identifying Black Chicagoans as the racial group that must receive priority in City contracting, economic opportunities, and revenue generating decisions. These statements are evidence of discriminatory intent under *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 253 (1977) (holding that "racially discriminatory intent" is evidenced by historical background, procedural departures, and "*contemporary statements of the decisionmakers*") (*emphasis added*).

---

[8]  *See* City of Chicago, Executive Order No. 2024-1, https://chicityclerk.s3.us-west-2.amazonaws.com/s3fs-public-1/reports/EO%202024-1.pdf.

39.     In a February 2025 interview with The TriiBE[9], the Mayor was asked: "What are your commitments to Black Chicagoans?" He responded:

> It's not enough to win the power, you have to protect the power. And the first thing that I did for our people was made sure that I put key Black people in positions of power to protect it. And I'll be honest with you. My wife hates when I speak like this, however, if anything were to ever happen to me, and God forbid, I have placed our people in key positions to make it almost impossible for them to do to us what they did 40 years ago.

> That's why it was important to have the first Black vice mayor in the history of Chicago, Ald. Burnett. We made sure that where the power moves in City Council, that our people were chairs of those committees. And then we took it one step further. We put key [Black] people in position in my office.

40.     In the same interview, the Mayor stated that Black Chicagoans had received "20 times" more funding than other groups under his administration and asserted that "our people did not get the benefit of knowing what I was doing for our people," referring exclusively to Black Chicagoans, and accusing mass media of intentionally withholding information about his ongoing commitments to Black Chicagoans.[10] These statements repeated the directive that City resources, economic development, and contracting opportunities be directed toward Black Chicagoans.

41.     According to reporting in the Chicago Tribune, the Mayor also described Chicago as entering a period of "Re-Reconstruction," a term he used to characterize his administration's economic and governmental priorities, and stated in now publicly available communications to aldermen and political allies that "our people need to hear more from us," reflecting a directive

---

[9] *See* Transcript of Interview of Mayor Brandon Johnson by Tiffany Walden, *Mayor Johnson Is Taking His Message Straight to Black Chicagoans*, THE TRiiBE (Mar. 3, 2025), https://thetriibe.com/2025/03/mayor-johnson-is-taking-his-message-straight-to-black-chicagoans/.

[10] *See* Tiffany Walden, *Mayor Johnson Is Taking His Message Straight to Black Chicagoans*, THE TRiiBE (Mar. 3, 2025), https://thetriibe.com/2025/03/mayor-johnson-is-taking-his-message-straight-to-black-chicagoans/.

that policy outcomes reached and benefited Black constituents, including in contracting and procurement.[11]

42. At the Apostolic Church of God in May 2025[12], in the specific context of City contracting, the Mayor described his administration's economic agenda as an obligation to return economic benefits specifically to Black Chicagoans, stating:

> And one thing that I know for sure that I have to do over these next two years, every single dime that our people have been robbed of, I want to make sure that that is returned two- [or] three-fold, because I believe in something called pressed down, run over. That is what we have to make sure that happens within our communities.[13]

43. The Mayor further explained the mechanism for implementing this race-priority agenda to achieve that objective, stating that "our people hire our people," and then listing top officials appointed by race ("And so business and economic neighborhood development, the deputy mayor is a black woman. Department of planning development is a black woman. Infrastructure deputy mayor is a black woman. Chief operations officer is a black man. Budget director is a black woman. Senior advisor is a black man. …"). He explained that these appointments were made so that "our people get a chance to grow their business."[14] The Mayor expressly linked contracting opportunities to the redistribution of resources to Black Chicagoans.

44. Across these statements, the Mayor consistently: (1) identified Black Chicagoans as "our people"; (2) described municipal contracting and economic initiatives as tools to deliver

---

[11] *See* Alice Yin, *Mayor Brandon Johnson Outreach to Black Chicago*, CHI. TRIBUNE (Mar. 17, 2025), https://www.chicagotribune.com/2025/03/17/mayor-brandon-johnson-outreach-to-black-chicago/.

[12] *See* Apostolic Church of God, "*Conversation with Mayor Brandon Johnson*" (video), https://acog-chicago.org/media/ck3tjtx/conversation-with-mayor-brandon-johnson.

[13] *See Conversation with Mayor Brandon Johnson* (YouTube video & transcript), https://www.youtube.com/watch?v=jcD_HXIFQW4 at 31:30-32:00.

[14] *Id*. at 38:45-40:35.

benefits "two- or three-fold" to that group; and (3) framed leadership appointments and departmental authority as instruments for achieving race-preferred outcomes.

45.     These policymaker statements were made before, during, and after the 2024 Riverwalk RFP evaluation period. They were known to and relied on by 2FM, OBM, and the Evaluation Committee Members. Together with the City's formal and published race-based policies, these statements established a clear directive that racial identity was to be treated as a positive factor in evaluating applicants and awarding contracts, including the 2024 Riverwalk RFP.

46.     These statements and policies were made before, during, and after the evaluation period for the 2024 Riverwalk RFP and were widely reported, well known within City departments, and understood by 2FM, OBM, and Evaluation Committee Members as part of the City's operative race-priority directive. They form part of the contemporary policymaker context in which the 2024 Riverwalk RFP rules were altered, procedures abandoned, and a non-Black business, Beat Kitchen, was disfavored in violation of the Constitution and Title VI.

**III.     Implementation of the City's Race-Prioritization Framework Within the 2024 Riverwalk RFP Process**

47.     The City's race-prioritization frameworks – and the Mayor's repeated directives that City economic opportunities must benefit one specific race, were not symbolic or aspirational. They were operational expectations communicated to, and understood by, the departments and personnel responsible for administering the 2024 Riverwalk RFP, including 2FM, OBM, and each Evaluation Committee Member. These employees were simultaneously subject to departmental REAP obligations, the Budget Equity Tool, and ongoing policymaker messaging that procurement, licensing, and revenue-generating opportunities must advance the City's racial-priority agenda.

48.     At the time the 2024 Riverwalk RFP was issued and evaluated, personnel within 2FM and OBM were subject to mandatory departmental REAPs, Budget Equity Tool requirements,

and ongoing policymaker directives emphasizing that contracting, procurement, and revenue opportunities must be used to advance the interests of the City's "priority" racial group. These directives communicated that race was to be treated as a positive factor in procurement decisions, including concession awards.

49.     Consistent with these directives, the Evaluation Committee departed from multiple mandatory RFP requirements, altered rules for a preferred vendor, solicited and accepted an untimely and deficient proposal from Haire's, manipulated scoring criteria and, as a result, penalized Beat Kitchen despite its complete and superior submission. These procedural departures, timing anomalies, and outcome-driven deviations align with the Mayor's contemporaneous racial directives and the City's formal race-based policies, and are evidence of discriminatory intent.

## IV.     The 2024 Riverwalk RFP Background and Requirements

50.     Pursuant to Section 10-36-145(d) of the MCC, on March 8, 2024, 2FM issued the 2024 Riverwalk RFP, a public solicitation of proposals entitled a "Request for Proposals to Operate Concessions on the Chicago Riverwalk – Specification 1293783." *See* true and accurate copies of the 2024 Riverwalk RFP and Addendum attached as **Exhibit A** and **Exhibit B**, respectively.

51.     The 2024 Riverwalk RFP sought qualified concessionaires for two distinct sites along the Chicago Riverwalk:

a.  **Location 1**: 65 East Riverwalk South in the Chicago Riverwalk Community Marketplace, designated for retail or cultural programming; and

b.  **Location 2**: 91-95 East Riverwalk South, adjacent to the DuSable Bridge on Michigan Ave., designated exclusively for a full food and beverage operation requiring complete culinary permitting, liquor licensing, and continuous restaurant operations.

52.     The 2024 Riverwalk RFP required the selected Licensee for Location 1 to assume "complete responsibility" for developing and operating a retail or cultural programming

concession. Location 1 was specifically designated as part of the City's "Chicago Riverwalk Community Marketplace," a City-created program to showcase "local Chicago owned businesses which highlight the City's rich culture."

53. Location 2 had no such designation and contained significantly more demanding requirements, including that respondents must: obtain and maintain all relevant federal, state, and local food and liquor permits; receive, store, prepare, and serve alcohol and meals; operate a full restaurant; and maintain all insurance required for the service of beer, wine, and liquor.

54. The 2024 Riverwalk RFP mandated strict submission requirements ("Proposals must include the following items organized and tabulated in the order stated below"): "1. Cover Letter and Executive Summary stating the site being proposed; 2. Site Specific Concessions Operations Plan; 3. Qualifications and Experience Statement- including 3 Professional References; 4. Compensation Schedule Including Projected Annual Sales, Net Income and Cash Flows; 5. Opinion of Legal Counsel; 6. Statement of No Exceptions to License Agreement; 7. Executed Proposal Affidavit; 8. Business Information Statement; 9. EDS Certificate(s) of Filing; 10. Financial Statements from the previous 3 years."

55. The 2024 Riverwalk RFP further contained several mandatory requirements to qualify a proposal as responsive, including:

   a. Minimal Annual Guarantee ("MAG") (Section C.2.): "… Respondent is required to propose a MAG based upon a dollar amount per square foot for use of the Location or provide an explanation on how the Minimum Annual Guarantee being proposed was derived."

   b. Supplemental Revenue Fee (Section C.2.): "The MAG and Supplemental Revenue Fee must be proposed, either typed or hand-printed in ink, in the Proposal form, as required in Attachment B. Respondent must indicate the corresponding Location number(s) and provide separate proposal forms if it is submitting a proposal for multiple Locations." Moreover, "Proposals that have incomplete Attachment B may be deemed non-responsive."

    c.   Site-Specific Concession Operations Plan (Section D.2): Respondents "<u>must</u> provide" a "site design plan with total square footage indicating the footprint to be occupied, a list of operational requirements, including utilities, and also a location/area specific operations plan which includes documentation that describes Respondent's plans for providing food & beverage, recreational, cultural and/or educational concessions."

    d.   Opinion of Counsel (Section D.7): "The opinion of Respondent's legal counsel <u>must</u> state whether any litigation is pending or contemplated that could affect the Respondent's ability to implement its Proposal."

    e.   Financial Statements (Section D.13.): "Respondents <u>must</u> submit the following financial statements to the City; Complete financial statements including a balance sheet, income statement and statement of cash flows, prepared in accordance with generally accepted accounting principles, for the most recent three (3) complete financial statements. Footnote disclosures must accompany the year-to-date financial statements. If available, financial statements audited or certified by an independent certified public accountant should be provided; otherwise, a notarized statement certifying the accuracy of the financial information and signed by an officer of the proposing entity <u>must</u> accompany the financial information."

    f.   A subsequent addendum provided, among other things, that "[t]he site plan [for Location 2] <u>must</u> include an ADA accessible path to the entrance of the McCormack Bridgehouse and Chicago River Museum which is located at 99 E. Riverwalk South. Site plans that obstruct access to the McCormack Bridgehouse and Chicago River Museum will not be well-received."

(<u>Emphases added</u>).

56.    Section C.2. also notably provided that the "City prefers to receive Concession License Fees prior to December 31 of each year in order [to] be compliant with reporting requirements of the federal government."

57.    The 2024 Riverwalk RFP also set deadlines and represented that all respondents would be evaluated fairly and in accordance with the stated criteria: Site Specific Concession Operations Plan (10 points); Implementation Plan (10 points); Respondent Experience and Qualifications (10 points); Green Sustainable Plan (10 points); Compensation to the City (10 points); Projected Annual Sales (10 points); Net Income and Cash Flows (10 points); Respondent

Organization & Financial Statements (10 points); Legal Actions (Pass or Fail); and Conflict of Interests (Pass or Fail).

58.     2FM formed an Evaluation Committee for the 2024 Riverwalk RFP, which it said included "a diverse group of individuals from multiple City Departments to ensure fairness and a broad perspective," and was composed of the Evaluation Committee Members, Defendants Woods (2FM), Villafranca (DCASE), Pai (BACP), Forbes (OBM), Kelly (2FM), and Viramontes (2FM).

59.     By the April 15, 2024 deadline for the 2024 Riverwalk RFP, the City received: four (4) timely proposals for Location 1, scoring between 250 and 420 points; and one (1) timely response for Location 2 – Beat Kitchen – which scored 331 points. Beat Kitchen was the sole responsive proposer for Location 2. *See* a true and accurate copy of Beat Kitchen's Proposal, attached as **Exhibit C**.

60.     Haire's Location 1 proposal, dated April 2024 ("Haire's April 2024 Proposal"), was markedly incomplete and non-responsive. See a true and accurate copy of Haire's April 2024 Proposal, attached as **Exhibit D**. It failed to:

    a.  Provide any MAG or explanation;

    b.  Submit a proper Attachment B, instead placing a "?" where the MAG and Supplemental Revenue Fee must be proposed;

    c.  Provide complete financial statements, offering only a single page of a 1040 Individual Income Tax Return, a single page of a profit and loss statement, and a single page of a statement of financial position for the year 2021, as well as a single page of a profit and loss statement, and a single page of a statement of financial position for the year 2022;

    d.  Provide certified audits of financial statements or notarized certification;

    e.  Provide the required Opinion of Counsel;

    f.  Provide any proposed compensation for two extension years after the three-year term of the license agreement (Haire's compensation proposal was for a total of $25,000 over the three-year term of the license agreement only).

61. Such deficiencies required disqualification under the mandatory criteria of the 2024 Riverwalk RFP. Here, however, Haire's deficient and nonresponsive April 2024 Proposal nevertheless received a total score of 299 and ranked third out of four for Location 1. Ultimately, the top scoring respondent for Location 1 was selected for Location 1. *See* a true and accurate copy of the Master Scorecard, attached as **Exhibit E**.

62. Under MCC § 10-36-145(d), the 2FM Commissioner is authorized to negotiate and execute Riverwalk concession agreements only "after publicly soliciting proposals." This requirement is mandatory, serves as a condition precedent to the exercise of the 2FM Commissioner's contracting authority, and exists to ensure fairness, transparency, competition, and equal treatment in Riverwalk concessions. The provision prohibits the Commissioner and her delegates from privately soliciting, accepting, or evaluating late proposals outside the publicly noticed solicitation period, and requires that all vendors be evaluated solely based on timely, publicly submitted proposals and the mandatory criteria disclosed in the solicitation.

63. To the extent the 2024 Riverwalk RFP contains any discretionary phrasing – like the statement that late proposals "may not be considered" – such language cannot expand or override the 2FM Commissioner's statutory limitations under MCC §10-36-145(d). That provision necessarily limits the Commissioner's authority to proposals submitted during the publicly announced solicitation period. Accordingly, any permissive phrasing cannot be interpreted to authorize the 2FM Commissioner, 2FM staff, or the Evaluation Committee to solicit, accept, or evaluate a late proposal, nor can it transform a statutorily mandatory public solicitation requirement into a discretionary one. The mandatory portions of the 2024 Riverwalk RFP – representing that only timely proposals will be reviewed and evaluated – are consistent with the MCC. Any inconsistent language is unlawful if it purports to authorize actions the MCC forbids.

64.     This statutory limitation is reinforced by the 2024 Riverwalk RFP, which stated that "timely responses" will be reviewed and evaluated, and warned that incomplete or nonresponsive proposals will or may be rejected and/or deemed nonresponsive. Accordingly, the 2FM Commissioner and the Evaluation Committee Members, who act under the Commissioner's delegated authority, lacked lawful authority to solicit, accept, or evaluate any proposal other than those submitted by the public deadline. Any solicitation, acceptance, or evaluation of a late or private proposal exceeded lawful authority, violated § 10-36-145(d), and deprived compliant respondents – including Beat Kitchen – of the fair, rule-bound, and publicly transparent process required by the MCC, the 2024 Riverwalk RFP, and federal and state law. OBM and the Budget Director subsequently ratified and advanced the resulting procurement steps despite these violations, further embedding the unlawful process into the City's decision-making structure.

65.     The 2024 Riverwalk RFP also contains inconsistent phrasing regarding the treatment of late proposals, including that late proposals "may not be considered," but elsewhere confirming that "[a]ll timely responses to this RFP will be reviewed and evaluated." This permissive phrasing cannot be interpreted in isolation and cannot expand the 2FM Commissioner's statutory authority under MCC §10-36-145(d), which requires that concession agreements be negotiated and executed only "after publicly soliciting proposals." When read with the MCC, the only lawful interpretation is that the 2FM Commissioner and Evaluation Committee may evaluate only those proposals submitted during the public solicitation period. Again, any provision suggesting discretion to consider late proposals is void to the extent it conflicts with the MCC. This interpretation is also consistent with the subsequent representation by 2FM that only "timely responses" will be reviewed and evaluated. Any permissive language, therefore, cannot authorize

the solicitation, acceptance, or evaluation of Haire's privately requested and late proposal and cannot immunize the deviations undertaken here.

66.     Despite Haire's April 2024 Proposal being nonresponsive and deficient – and despite having a complete, timely, and superior submission from Beat Kitchen, the sole responsive proposer for Location 2 – the Evaluation Committee Members, led by Defendants Woods and Viramontes, improperly solicited and accepted a late proposal from Haire's for Location 2 in May 2024, weeks after the deadline set by the 2024 Riverwalk RFP. This private, secretive, post-deadline solicitation violated the 2024 Riverwalk RFP's mandatory provisions, the City's procurement rules, and the 2FM Commissioner's limited authority under MCC § 10-36-145(d) to proceed only "after publicly soliciting proposals." The Budget Director and OBM subsequently ratified and advanced the resulting evaluation and award despite these violations. This conduct was also inconsistent with the City's representations that only timely proposals would be reviewed. Plus, when the Evaluation Committee privately solicited Haire's late submission, the City already possessed a fully compliant, lucrative, and timely proposal from Beat Kitchen.

67.     Unbeknownst to Beat Kitchen, however, the Evaluation Committee had already internally expressed a preference that Location 2 be awarded to a Black-owned vendor. *See* a true and accurate copy of Michelle Woods' Scorecard for Haire's Location 1 Proposal, attached as **Exhibit F**. This confirms that racial identity was treated as an operative and favorable factor in evaluation and selection, notwithstanding the requirement of a neutral, race-blind process.

68.     This race-priority motive directly informed the Evaluation Committee's subsequent actions, including its decision to solicit a late, secretive, and private proposal from Haire's for Location 2 despite Beat Kitchen's superior, timely, and compliant submission.

69. The record of the Evaluation Committee Members' actions confirms that the private and late solicitation of Haire's proposal was intentional and outcome oriented. Defendant Woods, a long-time employee of 2FM and former deputy director who understood the race-preferred vendor the City, 2FM, and OBM required, memorialized the intent and revealed the race-preference in her scoresheet for Haire's April 2024 Proposal:

> Provided a proposal for the Marketplace. Would
> like to see if they would be insterested [*sic*] in Location
> 2 instead.
> Would be great to get a black woman owned
> business and can promote her other locations.

**Ex. F**.

70. Then, contrary to the plain terms and requirements of the 2024 Riverwalk RFP and MCC, on May 7, 2024, Defendant Viramontes confirmed via email to the other Evaluation Committee Members that 2FM and the Evaluation Committee secretly solicited from Haire's a late proposal for Location 2, stating: "I have uploaded Haire's Gulf Shrimp Proposal for location #2 in our Evaluation Committee's group folder. As well as to this email for convenience. You will also find that I have added another row to your scorecard to evaluate the proposal. It is named 'Haire's Gulf Shrimp - Location #2 Proposal.'" *See* a true and accurate copy of Viramontes' Email to the Evaluation Committee Members, attached as **Exhibit G**.

71. Notwithstanding this unfair dealing, Haire's untimely proposal for Location 2, dated May 2024 ("Haire's Late Proposal"), was equally nonresponsive. *See* a true and accurate copy of Haire's Late Proposal, attached as **Exhibit H**. For example, Haire's Late Proposal:

   a. Was still missing key information for Location 2, including a Minimum Annual Guarantee, and included a nonresponsive question mark ("?") in the area where the "[t]he MAG and Supplemental Revenue Fee must be proposed, either typed or hand-printed in ink, in the Proposal form, as required in Attachment B";

   b. Incorrectly calculated other fees required by the 2024 Riverwalk RFP;

c.  Budgeted incomprehensible operating costs that are far too low when figuring the costs of labor, materials, equipment, etc. for a functioning restaurant on the Chicago Riverwalk;

d.  Contained incomplete compensation offerings to 2FM, which were now for a total of $44,500 over the three-year term of the license agreement and again failed to provide any compensation for the two extension years.

e.  Contained the same deficient financial statements as in the timely proposal for Location 1; the incomplete financial statements also were not audited and/or notarized as required;

f.  Did not contain an Opinion of Counsel;

g.  Haire's Site Specific Operations Plan for Location 1 and Location 2 were remarkably similar and neither satisfies the requirements of the 2024 RFP nor the addendum requirement regarding ADA accessibility.

72.  The Evaluation Committee, despite having no new meaningful information yet scoring Haire's on more challenging and onerous criteria for Location 2, incomprehensibly increased Haire's score from 299 (for Location 1) to 381 for Location 2 (**Ex. E**), including:

a.  **Operations Plan**: Five of six members gave Haire's the maximum score (10), despite an incomplete plan with no ADA compliance. <u>Conversely</u>, Haire's scored between zero (0) points to nine (9) points for its similarly sparse Site Specific Operations Plan for Location 1 – a much smaller and less complex space to operate.

b.  **Compensation**: Five of six awarded 9-10 points even though Haire's again failed to propose any MAG or supplemental fee. <u>Conversely</u>, Haire's scored between zero (0) points to ten (10) points for its Compensation to the City for Location 1, scores that appropriately recognized that Haire's did not even submit a MAG or supplemental revenue fee for Location 1. Indeed, this category depended entirely on submission of a proper MAG and Supplemental Fees.

c.  **Financial Strength**: Five of six gave maximum or near-maximum scores despite the unchanged, incomplete, uncertified financials. <u>Conversely</u>, Haire's scored between seven (7) points to ten (10) points, for its Financial Statements for Location 1, which were the identical and incomplete financial statements submitted for Location 2.

d. **Green Plan**: All six scored Haire's between 8 and 10 despite identical text previously scored as low as 0. <u>Conversely</u>, Haire's scored between zero (0) points to ten (10) points for its Green Sustainable Plan for Location 1 (again which is identical to the plan for Location 2). Of note, Haire's Green Sustainable Plan for both Locations 1 and 2 provided absolutely no specific information.

e. **Legal Actions**: Haire's received a "Pass" from all six members despite submitting no Opinion of Counsel.

73. The scoring cannot be reconciled with the 2024 Riverwalk RFP's objective and stated criteria and is evidence of pretext and intentional discrimination.

74. Beat Kitchen, the only timely proposer for Location 2, complied in all respects with the requirements of the 2024 Riverwalk RFP, and its proposal was superior in all respects:

a. Beat Kitchen submitted a Site-Specific Operations Plan that detailed its proposed operation for Location 2 including addressing the mandatory ADA accessibility requirement by providing "[o]n the eastern side of the patio, we installed two complementary rails, distinguishing our portion of the patio from that of the nearby museum. A gap in the middle was purposefully designed to ensure ADA access for museum guests, fostering inclusivity and ease of movement."

b. Beat Kitchen submitted a responsive compensation proposal for Location 2 which totaled over $1,392,000 for the term of concession license.

c. Beat Kitchen submitted three years of financials, specifically Accountant's audited statements for 2020, 2021, 2022, and 2023; Balance Sheets for 2020, 2021, 2022, and 2023; Cash Flows for 2020, 2021, 2022, and 2023; Income statements (Profit Loss -and prior year comparison) for 2020, 2021, 2022, and 2023; Tax returns for Beat Kitchen from 2020, 2021, and 2022; a tax return extension Form 7004 for 2023; and a certification of accuracy signed by Robert Gomez, principal of Beat Kitchen.

d. Beat Kitchen submitted a detailed Green Sustainable Plan with its Proposal for Location 2 which totaled three (3) pages and provided various sustainable initiatives including: food and product waste recycling; energy efficient appliances; employing a compost service; sourcing from local farms to reduce carbon footprint; eco-friendly packaging; partnering with breweries offering sustainable programming; and using vendors that provide a living wage to their employees.

75.     Notwithstanding that Beat Kitchen was the sole timely respondent for Location 2 with a complete, responsive, and lucrative proposal, the Evaluation Committee arbitrarily scored Beat Kitchen, improperly solicited and allowed Haire's to submit a late proposal for Location 2, and somehow, despite glaring deficiencies in Haire's Late Proposal, scored Haire's higher than Beat Kitchen for Location 2. These discrepancies, together with the known objective evidence, show intentional differential treatment favoring a race-priority vendor.

76.     The Evaluation Committee's draft recommendation, dated May 15, 2024, from the Evaluation Committee to the Commissioner of 2FM and Budget Director, referenced Haire's as "[a] Black woman-owned business from the Southwest Side," and explicitly listed the demographic of the recommended vendors, including Haire's as "Black."

77.     A draft of the Evaluation Committee recommendation, dated May 22, 2024, again identified Haire's as a "Black woman-owned business from the Southwest Side," who originally proposed on the "Marketplace location," but "the Evaluation Committee asked her to consider Location 2," followed immediately by a line of text that was meant to be deleted but was not:

beverage service. ~~The Evaluation Committee preferred , placed a bid on the food and beverage location.~~ The second proposal, The Beat Kitchen License Agreement expired earlier this year.

78.     The May 22, 2024 draft also again explicitly identified Haire's as "Black."

79.     In response to FOIA requests, on May 29, 2024, the City falsely stated that "a fair and equitable selection process" would take place and that only timely proposals "will be reviewed and evaluated," despite having already secretly solicited, evaluated, and recommended Haire's Late Proposal. *See* true and accurate copy of the City's May 29, 2024 FOIA Response, **Exhibit I**.

80.     Almost one year after the evaluation committee recommendations, on April 3, 2025, Mr. Robert Gomez from Beat Kitchen received a letter from 2FM (dated April 2, 2025) advising him that Beat Kitchen's "proposal was reviewed, discussed, and scored by an Evaluation

Committee based on the evaluation and selection criteria outlined in the RFP document[,]" but that Beat Kitchen was not chosen. *See* a true and accurate copy of the April 2, 2025 correspondence, attached as **Exhibit J**.

81.     That same day, Beat Kitchen requested a debriefing meeting with Viramontes, who responded that she would have a debriefing meeting "when I am given the ok to do so."

82.     On May 23, 2025, and June 9, 2025, Beat Kitchen sent additional FOIA requests to the City seeking documentation regarding this decision.

83.     On June 23, 2025, these FOIAs were denied on the basis that no award had been made. Less than three days later, the City, through 2FM and OBM, entered into a Chicago Riverwalk Master Concession License Agreement with Haire's for Location 2 ("Haire's Agreement"). The Haire's Agreement is dated June 26, 2025, however, it specifically provides for Haire's to begin occupancy at Location 2 on June 1, 2025, and references the term of the Agreement as beginning on June 1, 2025. *See* true and accurate copies of the City's June 23, 2025 FOIA Denial and Haire's Agreement, attached as **Exhibit K** and **Exhibit L**, respectively.

84.     On July 15, 2025, Mr. Gomez from Beat Kitchen was advised by Defendant Viramontes via email that 2FM is "now able to share with you the requested information through FOIA." Once forced to disclose records, the City admitted the Evaluation Committee had completed scoring and made its recommendation nearly a year earlier.

85.     This timeline underscores the City's concealment and discriminatory intent.

86.     Upon receipt of certain documents through FOIA, and as already alleged above, it became clear that Defendant Woods and the other Evaluation Committee Members arbitrarily scored Beat Kitchen, and scored up Haire's, based on the City's race-priority directives.

87.     Moreover, on information and belief, it is extremely rare for the City, 2FM and/or OBM, to accept late proposals or bids in solicitation and procurement evaluations. It is even more rare, if not completely unprecedented, for the City, 2FM and/or OBM, to actively solicit a late proposal after an RFP deadline, particularly when it already had a timely and responsive proposal from another bidder in hand (*i.e.*, Beat Kitchen).

88.     These deviations, solicitations, and manipulations were consistent with and driven by the City's race-priority directives, departmental mandates, and policymaker instructions to deliver economic opportunities to Black Chicagoans.

**V.      The City's Policies Were a Moving Force Behind the RFP Violations**

89.     The discriminatory administration of the 2024 Riverwalk RFP was not an isolated deviation or unauthorized action by low-level employees. It was the predictable, intended, and ratified result of the City's policies, practices, and final policymaker directives prioritizing the advancement of a preferred racial group in City contracting and economic decisions.

90.     A municipality is liable where the constitutional violation is caused by: (a) an express policy, (b) a widespread custom or practice, or (c) a decision by an official with final policymaking authority. This case meets all three.

91.     The City's departmental racial-prioritization mandates – including REAPs, the Budget Equity Tool, and the Mayor's Reparations Executive Order – direct departments to embed racial-priority analysis, prioritize racial identify-based outcomes, and integrate those considerations into procurement and concession decisions.

92.     These mandates were adopted across City departments, enforced by the Mayor's Office through OERJ and OBM, and implemented as binding operations requirements.

93.     Evaluation Committee Members, including all individual Defendants, operated under these mandates during the 2024 Riverwalk RFP. Public statements by the Mayor and City leadership reinforced an expectation that contracting opportunities should be awarded in alignment with race-priority goals.

94.     This widespread practice conditioned staff to expect, deliver, and justify racially aligned procurement outcomes, even where the controlling RFP contained no such criteria.

95.     The conduct here – including the solicitation of a late proposal, inflated scoring of Haire's, arbitrary scoring of Beat Kitchen, manipulation of mandatory requirements, and race-tracking in recommendation drafts – fits squarely within this broader practice and was driven by final-policymaker directives, including the Mayor, Commissioner of 2FM and Budget Director.

96.     Under the MCC, the 2FM Commissioner negotiates and executes Riverwalk concessions, and the Budget Director must approve all concession awards. Both serve at the pleasure of the Mayor, who repeatedly emphasized publicly that economic opportunities must ensure that Black Chicagoans "get a chance to grow their business."

97.     The City's policies, practices, and final policymaker directives were a moving force behind the violations of Beat Kitchen's equal protection, due process, and statutory civil rights.

98.     Absent these policies, the Evaluation Committee would have followed the RFP, rejected late submissions, enforced mandatory submission requirements in the 2024 Riverwalk RFP, and awarded Location 2 to Beat Kitchen as the only timely, fully responsive proposer.

99.     Instead, the Evaluation Committee violated every one of those principles to produce a race-aligned outcome consistent with the City's policy directives.

100.     Beat Kitchen lost a multi-year Riverwalk concession with projected revenue exceeding seven figures. Beat Kitchen invested significant time, money, and reliance effort

preparing a comprehensive proposal, and it would have obtained the award but for the Defendants' unlawful conduct. Beat Kitchen has been damaged in numerous ways, including, but not limited to: denial of equal protection, deprivation of due process, violation of statutory civil rights, economic damages, lost business opportunities, and harm to its liberty and property interests.

## Causes of Action

### Count I: Violation of the Equal Protection Clause (42 U.S.C. § 1983)
(Against all Defendants)

101.    Beat Kitchen incorporates Paragraphs 1-100 as Paragraph 101.

102.    At all relevant times, Defendants acted under color of state law.

103.    Beat Kitchen is a minority-owned but non-Black Chicago business, submitted the sole timely, complete, compliant, and superior proposal for Riverwalk Location 2 and had the right to have its proposal evaluated under neutral, race-blind criteria, as stated in the RFP and required by the Equal Protection Clause.

104.    The Evaluation Committee Members, including Defendants Woods, Villafranca, Pai, Forbes, Kelly, and Viramontes, intentionally treated Plaintiff differently because it was not a Black-owned vendor, including by:

   a.   Soliciting and accepting an untimely, non-responsive proposal from a race-preferred vendor, Haire's;

   b.   Engineering a location "switch" for Haire's despite Beat Kitchen's exclusive timely proposal;

   c.   Manipulating objective scoring to elevate Haire's and depress Beat Kitchen; and

   d.   Tracking and emphasizing racial identity (*e.g.*, describing Haire's as "Black woman-owned") in draft recommendations.

105.    These actions were taken to ensure that a race-preferred vendor – Haire's – received the Riverwalk award in accordance with the City's race-priority directives.

106.     Defendant 2FM, by Commissioner Hernandez-Tomlin, and OBM, by Budget Director Guzman, possessed final decision-making authority, and approved, ratified, and implemented this race-based outcome.

107.     The City, through its race-priority frameworks, departmental mandates, REAPs, Budget Equity Tool, and the Mayor's public directives, encouraged and directed race-based procurement outcomes and caused the discrimination here.

108.     The discrimination lacked any compelling governmental interest and was not narrowly tailored.

109.     As a direct and proximate result of Defendants' intentional discrimination, Beat Kitchen suffered economic losses, including loss of concession revenues and profits, as well as loss of business opportunities, goodwill, reputational harm, and other damages.

110.     Beat Kitchen seeks compensatory damages, declaratory and injunctive relief, attorneys' fees, costs, and any other amounts to which it is entitled.

### Count II: Violation of 42 U.S.C. § 1981 (42 U.S.C. § 1983)
(Against all Defendants)

111.     Beat Kitchen incorporates Paragraphs 1-110 as Paragraph 111.

112.     Beat Kitchen is a Hispanic-owned business with the capacity to enter into and perform concession contracts with the City, including the 2024 Riverwalk RFP concession contract.

113.     Defendants interfered with Beat Kitchen's right to make and enforce contracts on the same basis as Black vendors, as guaranteed by 42 U.S.C. § 1981, by intentionally preventing Beat Kitchen from obtaining the Riverwalk concession contract because of race and by favoring a race-preferred vendor.

114. Defendants' conduct, including secretly soliciting and accepting a late and nonresponsive proposal from a race-preferred vendor, Haire's, manipulating scores, and applying race-based criteria, was undertaken to deprive Beat Kitchen of an equal opportunity to contract.

115. As a direct and proximate result, Beat Kitchen lost a valuable concession contract, associated revenues and profits, and other contractual and economic opportunities.

116. Beat Kitchen seeks compensatory damages, declaratory and injunctive relief, attorneys' fees, costs, and any other amounts to which it is entitled.

## Count III: Violation of Procedural Due Process (42 U.S.C. § 1983)
(Against all Defendants)

117. Beat Kitchen incorporates Paragraphs 1-116 as Paragraph 117.

118. Beat Kitchen possessed a legitimate entitlement and expectation that its timely, complete, and compliant proposal would be evaluated in accordance with the mandatory procedures, criteria, and representations set forth in the 2024 Riverwalk RFP and applicable procurement norms and laws.

119. Beat Kitchen's protected entitlement arises from binding statutory and procedural requirements, including MCC § 10-36-145(d) and the 2024 Riverwalk RFP's mandatory provisions stating that only timely proposals "will" be reviewed and evaluated. These mandatory constraints created a legitimate expectation that no late, untimely, or privately solicited proposal would be considered. State and municipal officials may not extend, ignore, or alter statutory procurement authority in ways that deprive applicants of a guaranteed, rule-bound process. Any discretionary phrasing in the 2024 Riverwalk RFP cannot override the MCC's mandatory limits or eliminate Beat Kitchen's entitlement to a lawful evaluation.

120. Defendants deprived Beat Kitchen of this protected interest without due process by:

    a. Privately soliciting, accepting and scoring a late proposal from Haire's;

b.   Treating nonresponsive and incomplete submissions as compliant;

c.   Departing from, altering, or manipulating mandatory scoring criteria and results;

d.   Introducing undisclosed race-based criteria into the evaluation; and

e.   Withholding or concealing key evaluation materials and deliberative records for more than a year through FOIA denials and delays, preventing timely review of the deprivation.

121.    Defendants' conduct was arbitrary, capricious, unauthorized by law, and fundamentally inconsistent with the procedural protections required, and bears no reasonable relation to any legitimate government purpose.

122.    As a direct and proximate result, Beat Kitchen was deprived of protected property interests, lost economic opportunities, and suffered additional damages.

123.    Beat Kitchen seeks compensatory damages, declaratory and injunctive relief, attorneys' fees, costs, and any other amounts to which it is entitled.

### **Count IV: Municipal Liability Under 42 U.S.C. § 1983 (Monell)**
(Against the City of Chicago)

124.    Beat Kitchen incorporates Paragraphs 1-123 as Paragraph 124.

125.    The constitutional violations alleged in Counts I-III were caused by the City's official policies, practices, and customs, including, but not limited to:

a.   The City-wide race-priority framework;

b.   Departmental mandates to incorporate racial-identity considerations into procurement;

c.   The Mayor's contemporaneous public directives that contracting must deliver benefits to Black Chicagoans; and

d.   A widespread practice of using race and representation as selection criteria even when not authorized by the solicitation.

126.     The City's final policymakers – including the Mayor, and delegated policymakers like the 2FM Commissioner and the Budget Director – designed, enforced, communicated, and ratified these policies, which were carried out through the individual Defendant Evaluation Committee Members.

127.     The City's policymakers further exploited ambiguous or permissive RFP phrasing as post-hoc justification for actions that the MCC forbids, demonstrating that the constitutional violations were not isolated errors but the predictable result of deliberate municipal policy, direction, and ratification.

128.     The 2024 Riverwalk RFP process, including the solicitation of a late proposal, the use of race-priority selection, and the manipulation of scoring to favor a race-preferred vendor, was a direct manifestation of these policies and customs and not an isolated or rogue deviation.

129.     The City's policies, directives, and customs were the moving force behind the deprivation of Beat Kitchen's constitutional rights.

130.     Beat Kitchen seeks compensatory damages, declaratory and injunctive relief, attorneys' fees, costs, and any other amounts to which it is entitled.

### Count V: Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)
(Against the City of Chicago)

131.     Beat Kitchen incorporates Paragraphs 1-130 as Paragraph 131.

132.     Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

133.     At all relevant times, the City, 2FM and OBM, received federal financial assistance, including federal grants and funding related to infrastructure, facilities, capital planning, and other

programs, including for the Chicago Riverwalk Expansion Project. As a municipality receiving federal funds through 2FM and OBM, among other departments, the City is subject to Title VI's nondiscrimination requirements. The City is further subject to Title VI's nondiscrimination requirements through its explicit promise in the 2024 Riverwalk RFP to be so bound and "affirmatively ensure" compliance with Title VI.

134.    The Riverwalk concession procurement and award at issue are operations of departments and programs that receive federal financial assistance and, therefore, constitute a "program or activity" within the meaning of Title VI.

135.    Individual City actors, including the Evaluation Committee Members, 2FM Commissioner, and Budget Director, engaged in conduct that is attributable to and constitutes discriminatory administration by the City. Their actions – including soliciting, accepting, and evaluating a post-deadline proposal from Haire's, materially manipulating scoring criteria, treating similarly situated vendors differently, and considering race-preferred criteria not disclosed in the RFP – are alleged solely as evidence of the City's discriminatory administration of this federally funded program.

136.    Through its officials, employees, policies, and practices, the City intentionally discriminated against Beat Kitchen on the basis of race and ethnic identity in the administration of the 2024 Riverwalk RFP by, among other things:

      a.  engineering the acceptance and evaluation of an untimely proposal submitted by a preferred vendor;

      b.  applying undisclosed race-based preferences to elevate that vendor;

      c.  departing from mandatory and publicly represented procurement criteria; and

      d.  manipulating scoring standards to predetermine the outcome of the concession award.

137.    As a direct and proximate result of the City's discriminatory administration of a federally funded program, Beat Kitchen suffered injury, including lost economic opportunities, loss of a valuable concession location, reputational harm, and other damages.

138.    Beat Kitchen seeks declaratory relief, injunctive relief requiring a lawful and nondiscriminatory evaluation and award of the Riverwalk concession opportunity, compensatory damages, attorneys' fees, costs, and all other relief available under Title VI.

### Count VI: Violation of the Illinois Civil Rights Act of 2003 (740 ILCS 23/5)
(Against the City of Chicago)

139.    Beat Kitchen incorporates Paragraphs 1-138 as Paragraph 139.

140.    The City, 2FM, and OBM are units of local government under 740 ILCS 23/5. 2FM and OBM are included as components of the City of Chicago, the relevant unit of local government under the Illinois Civil Rights Act.

141.    The City administered the Riverwalk concession procurement in a manner that denied Beat Kitchen the full enjoyment of rights based on race.

142.    The City's intentional race-based treatment of Beat Kitchen and its policies and practices also caused a disparate impact on non-preferred vendors – including Beat Kitchen, a Hispanic-owned business – without legitimate justification.

143.    Beat Kitchen seeks compensatory damages, declaratory and injunctive relief, attorneys' fees, costs, and any other amounts to which it is entitled.

### Count VII: Violation of the Illinois Constitution – Equal Protection (Ill. Const. art. I, § 2)
(Against all Defendants)

144.    Beat Kitchen incorporates Paragraphs 1-143 as Paragraph 144.

145.    For the same reasons Defendants violated the federal Equal Protection Clause, Defendants' conduct also violates the Illinois Constitution's guarantee of equal protection.

146. Defendants' race-based decision making, favoritism, and manipulation of the process lack any rational basis related to a legitimate state interest and fail strict scrutiny.

147. Beat Kitchen seeks compensatory damages, declaratory and injunctive relief, attorneys' fees, costs, and any other amounts to which it is entitled.

**Count VIII: Declaratory Judgment –
Unlawfulness of Process and Award**
(Against all Defendants)

148. Beat Kitchen realleges Paragraphs 1-147 as Paragraph 148.

149. An actual, substantial controversy exists between Beat Kitchen and Defendants concerning the legality of the 2024 Riverwalk RFP solicitation, evaluation, scoring, and award, as well as Defendants' compliance with federal and state nondiscrimination requirements and adherence to MCC § 10-36-145(d).

150. MCC § 10-36-145(d) imposes a mandatory, non-discretionary duty on the 2FM Commissioner to negotiate and execute Riverwalk concession agreements only after a publicly noticed solicitation. This statutory condition precedent permits consideration only of proposals submitted pursuant to that publicly noticed solicitation and affords the 2FM Commissioner no discretion to expand the pool of eligible proposers to include late, secretly or privately invited, or otherwise noncompliant proposals.

151. Defendants violated MCC § 10-36-145(d), the mandatory terms of the 2024 Riverwalk RFP, and federal and state law by secretly soliciting, accepting, and evaluating a late proposal from Haire's, applying undisclosed and race-prioritized evaluation factors, disregarding mandatory scoring procedures, and failing to treat similarly situated proposers equally. These violations deprived Beat Kitchen of a fair and lawful process.

152.     Beat Kitchen does not seek a judicial award of the concession contract. Beat Kitchen seeks a declaration establishing the Parties' rights and obligations under federal, state, and municipal law, and declaring unlawful the 2024 Riverwalk RFP solicitation, evaluation, and award.

153.     Beat Kitchen seeks no damages from Haire's under this count. Haire's is joined solely to ensure that declaratory relief binds all interested parties.

154.     Pursuant to 28 U.S.C. §§ 2201-2202 and applicable Illinois law, Beat Kitchen is entitled to a declaration that Defendants' conduct in soliciting, administering, evaluating, and awarding the 2024 Riverwalk RFP violated federal, state, and municipal law, that the resulting award is unlawful, and that declaratory relief will clarify the Parties' rights and obligations prior to any further procurement activity.

**Count IX: Mandamus and Injunctive Relief –
Failure to Follow Procurement Requirements**
(Against all Defendants)

155.     Beat Kitchen realleges Paragraphs 1-154 as Paragraph 155.

156.     MCC § 10-36-145(d) imposes clear, ministerial, and mandatory obligations on the 2FM Commissioner and City officials, including the duties to: (a) consider only proposals submitted pursuant to a publicly noticed solicitation; (b) evaluate only proposals that were timely, complete, and responsive; and (c) apply disclosed, neutral, and nondiscriminatory criteria in scoring and making an award determination. These duties leave no room for official discretion.

157.     Defendants failed to perform these nondiscretionary duties by secretly soliciting, accepting, and evaluating a late proposal from Haire's, applying undisclosed racial-identity considerations, and departing from mandatory scoring and evaluation requirements. These failures were contrary to law, ultra vires, and void.

158.     Beat Kitchen has no adequate remedy at law because monetary damages cannot remedy the deprivation of a lawful, nondiscriminatory procurement process or restore Beat Kitchen's statutory right to compete on equal terms.

159.     Beat Kitchen does not seek an order directing the award of a concession license to any proposer. Beat Kitchen seeks prospective, process-oriented relief requiring Defendants to comply with their mandatory procurement obligations.

160.     Beat Kitchen is entitled to mandamus and injunctive relief directing Defendants to comply with MCC § 10-36-145(d), the stated and mandatory terms of the solicitation, and applicable federal and state nondiscrimination requirements, and enjoining Defendants from enforcing, performing, extending, or renewing the unlawful award.

161.     Beat Kitchen is further entitled to an order requiring that any further evaluation, scoring, or award decision on the 2024 Riverwalk RFP be conducted using neutral, nondiscriminatory, and publicly disclosed criteria, and limited to proposals that were timely, complete, and responsive as of the publicly noticed deadline. This relief is prospective and process based. It does not direct the outcome of any evaluation.

162.     Beat Kitchen is entitled to additional injunctive relief prohibiting Defendants from applying undisclosed, race-priority, or otherwise unlawful criteria in any further evaluation or procurement activity related to the 2024 Riverwalk RFP.

163.     Beat Kitchen seeks no damages against Haire's under this count. Haire's is included to ensure complete injunctive and mandamus relief that binds all necessary parties.

## Count X: Arbitrary and Capricious Administrative Action/ Common Law Certiorari
### (Against the City of Chicago)

164.     Beat Kitchen realleges Paragraphs 1-163 as Paragraph 164.

165. Courts may review final administrative or quasi-administrative actions of municipal officials to determine whether a decision was arbitrary, capricious, contrary to law, unsupported by the record, or in excess of authority.

166. The 2024 Riverwalk RFP evaluation and award constituted a quasi-administrative decision by City officials exercising delegated authority under MCC § 10-36-145(d). In doing so, officials performed adjudicatory type functions by reviewing proposals, scoring submissions, making responsiveness determinations, and issuing a final award.

167. Defendants' evaluation and award were arbitrary, capricious, discriminatory, and contrary to law because, among other reasons:

   a. City officials secretly and privately solicited, accepted, and evaluated a late proposal not submitted pursuant to a publicly noticed solicitation;

   b. City officials applied undisclosed racial considerations and race-prioritized directives not authorized by the RFP or the MCC;

   c. Mandatory evaluation procedures, scoring criteria, and responsiveness requirements were disregarded;

   d. Similarly situated proposers were not treated equally;

   e. The final award determination lacks a rational basis in the disclosed RFP criteria and the record and cannot withstand strict scrutiny; and

   f. Defendants failed to create or preserve an adequate record of evaluation sufficient for meaningful judicial review.

168. Defendants also exceeded their statutory authority by considering, evaluating, and awarding a concession license based on a proposal that could not legally be received or considered under MCC § 10-36-145(d), rendering the resulting award ultra vires and void.

169. No statutory or administrative procedure exists for reviewing the City's procurement award decision for the 2024 Riverwalk RFP. As a result, common law certiorari is the appropriate mechanism for judicial review of the City's actions.

170.     Beat Kitchen seeks no damages under this count. This count seeks only judicial review and nullification of the unlawful award.

171.     Under common law certiorari principles, Beat Kitchen is entitled to an order vacating the 2024 Riverwalk concession award because the decision was arbitrary, capricious, unsupported by the record, made in violation of mandatory legal requirements, and in excess of the City's lawful authority. Vacatur is the only remedy capable of correcting the unlawful actions.

## Request for Relief

WHEREFORE, Plaintiff, Beat Kitchen on the Riverwalk, LLC, respectfully requests that this Court enter judgment in its favor and against Defendants the City of Chicago, Michelle Woods, Nancy Villafranca, Lotika Pai, Andrew Forbes, Jennifer Kelly, Jaime Viramontes, and Haire's Gulf Shrimp Incorporated, and award the following relief:

A.     Declaratory Relief

1. A declaration that Defendants violated Beat Kitchen's rights under the Equal Protection Clause, Due Process Clause, 42 U.S.C. § 1981, Title VI, the Illinois Civil Rights Act, and the Illinois Constitution.
2. A declaration that the City's evaluation and award under the 2024 Riverwalk RFP – including the secret or private solicitation, acceptance, and scoring of a late proposal – were unlawful, arbitrary, capricious, and made in excess of statutory authority.
3. A declaration that the concession award to Haire's is void and of no legal effect.
4. A declaration that any use of race-based criteria, racial-identity preferences, or non-public selection factors in the administration of the 2024 Riverwalk RFP violated federal and state law and cannot be used in any future Riverwalk solicitations unless expressly authorized by law and consistent with constitutional requirements.

B.     Injunctive Relief

1. An order vacating the 2024 Riverwalk concession award to Haire's.
2. An order enjoining the City from enforcing, performing, renewing, or extending the unlawful award, and from permitting Haire's to receive contractual benefits under it.
3. An order directing the City to comply with MCC § 10-36-145(d) and all mandatory, nondiscretionary requirements of the 2024 Riverwalk RFP.

4. An order requiring that any further evaluation, scoring, or award decision under the 2024 Riverwalk RFP be conducted using neutral, nondiscriminatory, publicly disclosed criteria, limited to proposals that were timely, complete and responsive as of the publicly noticed submission deadline.

5. An order prohibiting the City, 2FM, OBM, and all acting officials from applying undisclosed, race-based, or race-prioritized criteria in any further or renewed evaluation or Riverwalk related procurement activity.

6. An order prohibiting expenditure of public funds, including Project Revenues or Riverwalk budget allocations, under the unlawful award.

7. An order requiring the City to produce all records related to the 2024 Riverwalk RFP solicitation, evaluation, scoring, and award, including drafts, scoring sheets, communications, directives, and memoranda, to permit meaningful judicial review and ensure prospective compliance.

C.  <u>Damages</u>

1. Compensatory damages against all non-nominal Defendants for economic losses, including lost profits, lost business value, and lost commercial opportunities.

2. Compensatory damages for reputational harm, competitive disadvantage, and loss of goodwill.

3. Nominal damages where appropriate.

4. Punitive damages against the individual Defendants for conduct undertaken with discriminatory intent, malice, or reckless disregard of rights.

D.  An award of reasonable attorneys' fees and costs.

E.  Such other legal, equitable, or declaratory relief – prospective or retrospective – as the Court deems necessary to redress the injuries caused by Defendants' unlawful conduct and to ensure future compliance with federal, state, and municipal law.

Dated: December 11, 2025

Respectfully submitted,

Beat Kitchen on the Riverwalk LLC

By: */s/ Jonathan D. Leach*
      One of Its Attorneys

Jonathan D. Leach (jleach@lkklawgroup.com)
William R. Klinger (wklinger@lkklawgroup.com)
Glenn A. Klinger (gklinger@lkklawgroup.com)
Leach | King | Klinger Law LLC
303 W. Madison Street, Suite 950
Chicago, IL 60606
Tel: 312-450-0204
*Counsel for Plaintiff, Beat Kitchen on the Riverwalk, LLC*